U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2021 JUN 25  AM 11: 44

CLERK

BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT
BURLINGTON DIVISION

UNITED STATES OF AMERICA          )
ex rel. MICHAEL STOCKS,           )
                                  )
      Plaintiff,                   )
                                  )      Case No: ___2:21-cv-169___
v.                                )
                                  )      **FILED UNDER SEAL**
EDGE PHARMA, LLC and              )
WILLIAM CHATOFF,                  )      **DO NOT PLACE IN PRESS BOX**
                                  )      **DO NOT ENTER ON PACER**
      Defendants.                  )
                                  )      **DEMAND FOR JURY**

## *QUI TAM* COMPLAINT

Pursuant to the *qui tam* provisions of the False Claims Act, 31 U.S.C. §§ 3729-3733 (the FCA or the False Claims Act), Relator Michael Stocks, on behalf of himself and the United States of America, alleges and claims against Defendants Edge Pharma, LLC, formerly known as Edge Pharmaceutical Services (Edge Pharma or Edge) and William Chatoff, as follows:

## INTRODUCTION

In 2012, contaminated drugs produced by the New England Compounding Center (NECC) caused a fungal meningitis outbreak that killed 64 people. The Department of Justice declared that: "the [NECC] callously disregarded patient health by cutting corners and prioritizing profits over safety. And they got away

2

with it by defrauding federal and state regulators." Although Edge Pharma hides behind the regulatory scheme that was introduced in the wake of that disaster, its conduct is in fact highly similar. Relator Stocks, an experienced pharmaceutical quality professional, witnessed the inexperienced and unprincipled leadership at Edge prioritize profits over safety at every turn, always cutting corners to push product out the door regardless of risk. As a result, Edge – under the direction of Chatoff – introduces compounded drugs into the federally funded marketplace that are adulterated, misbranded, and unsafe. When faced with regulatory scrutiny, Edge obfuscates and deceives. When Relator Stocks attempted to prevent this conduct, institute required compliance measures, and adhere to requirements to recall dangerous products, he was alienated by company leadership and eventually terminated.

## JURISDICTION AND VENUE

1. This action arises under the False Claims Act, 31 U.S.C. §§3729-33. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331. Jurisdiction is also authorized under 31 U.S.C. §3732(a).

2. Venue lies in this judicial district pursuant to 31 U.S.C. §3732(a), because Defendants qualify to do business in the State of Vermont, transact substantial business in the State of Vermont, transact substantial business in this judicial district, and can be found here. Furthermore, Defendants committed

within this judicial District acts proscribed by 31 U.S.C. §3729, to-wit: Defendants caused false claims to be submitted by introducing drugs into the marketplace that were adulterated and misbranded under federal statute, some of which were paid for under federal healthcare programs. In so doing, Defendants made and used false records that were material to these false claims.

## PARTIES

3.    Defendant Edge Pharma is a Delaware limited liability company headquartered in Colchester, Vermont. In operation since at least 2014, Edge holds itself out as an "FDA registered 503B Outsourcing Facility," and "one of the leaders in 503B Outsourcing," offering almost 100 compounded pharmaceutical products to thousands of hospitals, surgery centers, and clinics across the nation. As a self-proclaimed industry leader, Edge also purports to provide training to other compounding pharmacists, including in the area of compliance with Current Good Manufacturing Practice (cGMP) guidelines.

4.    Defendant William Chatoff is the President and CEO of Edge Pharma. According to his own account, Chatoff perceived a market (and regulatory) opportunity following the NECC disaster and founded Edge Pharma. He then staffed Edge with a Chief Operating Officer and a Director of Quality Control who collectively had zero experience running a sterile pharmaceutical compounding facility. As described more fully below, Chatoff's constant goal is

4

to push product and generate revenue, with little regard to compliance or safety. Chatoff completely dismisses FDA cGMP requirements and, when reminded of them, responds: "It's my fucking company and I'll do whatever the fuck I want."

5.     Relator Michael Stocks is an experienced pharmaceutical industry compliance professional.     Since approximately 2008, Relator Stocks has concentrated professionally on pharmaceutical compliance and quality issues. When he was hired by Edge Pharma as Quality Manager in November, 2019 and soon thereafter promoted to Senior Director of Quality Assurance, Relator Stocks immediately recognized that Edge and Chatoff were operating in flagrant violation of cGMP requirements—without a legitimate quality apparatus, no focus on compliance and no state-of-control whatsoever.

6.     Prior to filing this Complaint, Relator has voluntarily disclosed to the United States the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3730(e)(4)(A), Relator is the original source of the information for purposes of that section. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator has voluntarily provided that information to the Government before filing this Complaint. Relator is serving on the United States contemporaneously herewith

a statement of the material evidence in his possession upon which his claims are based.

## APPLICABLE LAW

### I. The False Claims Act

7.     The Federal False Claims Act ("FCA"), 31 U.S.C. §§ 3729-3733, provides, *inter alia*, that any person who: (1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval or (2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim is liable to the United States for a civil monetary penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104–410 [1]), plus treble damages.  31 U.S.C. § 3729(a)(1)(A), (B), (C), (G).

8.     Under the FCA, (1) the terms "knowing" and "knowingly" (A) mean that a person, with respect to information (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.  31 U.S.C. § 3729(b)(1).

9.     The FCA defines the term "claim" as (A) any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.  31 U.S.C. § 3729(b)(2).

10.     Additionally, the FCA provides relief from retaliatory actions: (1) Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop one or more violations of this subchapter.  31 U.S.C. § 3730(h).

11.     Introducing adulterated and misbranded pharmaceutical products into the marketplace and knowingly selling adulterated and misbranded drugs to

the United States has been the subject of numerous enforcement actions, including actions under the False Claims Act.[1] Accordingly, misrepresentations that drugs were produced in GMP compliant, safe, and non-contaminated environments are material to payment and such a misrepresentation results in false claims. *See Universal Health Services, Inc. v. U.S.*, 136 S.Ct. 1989, 2003 (2016).

## II.    Federal Requirements for 503B Outsourcing Facilities

12.    Following the New England Compounding Center disaster, Congress amended the Food Drug and Cosmetic Act (FDCA) with the aim of setting stricter standards for the sale of compounded drugs. Under the FDA regulatory scheme established by the Drug Quality and Security Act (DQSA), compounded drugs are those produced through the act of "combining, admixing, mixing, diluting, pooling, reconstituting, or otherwise altering of a drug or bulk drug substance to create a drug."[2]    Section 503B of the DQSA established a process for compounders to register with the FDA as Outsourcing Facilities.    If these Outsourcing Facilities comply with the requirements of Section 503B, they

---

[1] The following case demonstrates the Department of Justice has taken action against pharmaceutical manufacturers that knowingly produce drugs in contaminated environments. *See United States ex rel. Christopher Wall v. Baxter International, Inc. et al.*, No. 13cv42 (W.D.N.C.) Department of Justice Press Release "Baxter Healthcare Corporation Pay More Than \$18 Million to Resolve Criminal and Civil Liability Relating to Sterile Products." Available at: https://www.justice.gov/opa/pr/baxter-healthcare-corporation-pay-more-18-million-resolve-criminal-and-civil-liability

[2] 21 U.S.C. § 353b(d)(1).

are exempt from certain requirements of the FDCA that apply to other pharmaceutical manufacturers – such as pre-market review for the safety and effectiveness of a new product.

13. Section 503B requires are that the Outsourcing Facility properly label its drugs: The label of the drug must include:

(i) the statement "This is a compounded drug." or a reasonable comparable alternative statement (as specified by the Secretary) that prominently identifies the drug as a compounded drug;

(ii) the name, address, and phone number of the applicable outsourcing facility; and

(iii) with respect to the drug—

(I) the lot or batch number;

(II) the established name of the drug;

(III) the dosage form and strength;

(IV) the statement of quantity or volume, as appropriate;

(V) the date that the drug was compounded;

(VI) the expiration date;

(VII) storage and handling instructions;

(VIII) the National Drug Code number, if available;

(IX) the statement "Not for resale", and, if the drug is dispensed or distributed other than pursuant to a prescription for an individual identified patient, the statement "Office Use Only"; and

(X) subject to subparagraph (B)(i), a list of active and inactive ingredients, identified by established name and the quantity or proportion of each ingredient.[3]

14.     Under federal law, a drug is deemed adulterated "if it has been prepared, packed, or held under insanitary conditions whereby it may have been contaminated with filth, or whereby it may have been rendered injurious to health."[4]  A drug is also deemed adulterated "if it is a drug and the methods used in, or the facilities or controls used for, its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with **current good manufacturing practice** to assure that such drug meets the requirements of this chapter as to safety and has the identity and strength, and meets the quality and purity characteristics, which it purports or is represented to possess."[5]

---

[3] 21 U.S.C. § 353b(a)(10)(A).
[4] 21 U.S.C § 351(a)(2)(A).
[5] 21 U.S.C § 351(a)(2)(B)(emphasis added).

15.    As such, Outsourcing Facilities are prohibited from marketing drugs that are prepared under unsanitary conditions and are required to strictly adhere to Current Good Manufacturing Practices.[6]

16.    Knowingly selling an "adulterated" drug is a felony.  21 U.S.C. § 333(a)(2).

17.    Moreover, the FDA requires that drug labeling must be truthful and not misleading.  If a drug's labeling is false or misleading, the drug is deemed "misbranded." 21 U.S.C. § 352.

18.    Misbranded drugs may not be sold, transported or received in the United States and therefore may not be sold to the United States Government. 21 U.S.C § 331.  Knowingly selling a "misbranded" drug is a felony.  21 U.S.C. § 333(a)(2).

19.    "The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article."  21 U.S.C. § 321(m).

20.    "If an article is alleged to be misbranded because the labeling or advertising is misleading, then in determining whether the labeling or advertising is misleading there shall be taken into account (among other things) not only

---

[6] *See also* U.S. Department of Health and Human Services Office of Inspector General: Most Hospitals Obtain Compounded Drugs From Outsourcing Facilities, Which Must Meet FDA Quality Standards, available at https://oig.hhs.gov/oei/reports/oei-01-17-00090.pdf

representations made or suggested by statement, word, design, device, or any combination thereof, but also the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences which may result from the use of the article to which the labeling or advertising relates under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual." 21 U.S.C. § 321(n).

### III.   cGMP Requirements—Which Defendants Violated

21.    In the form of cGMP requirements, the FDA has promulgated minimum standards for the production, storage, and distribution of drugs. Under the Code of Federal Regulations, these cGMPs are set forth in Parts 211, 225, and 226 of Chapter 21 of the Code.[7]  Some requirements violated by Defendants are summarized as follows:

22.    Section 211.42 provides that Defendants are required to maintain in their facility "separate or defined areas or such other control systems for the firm's operations as are necessary to prevent contamination or mixups . . ." Under this requirement, for example, Defendants must maintain systems for receiving and storing drug components to ensure that contamination or mixup does not occur. Defendants are further required to develop and maintain systems

---

[7] 21 C.F.R. § 210.1.

for "Aseptic processing" – that is, to maintain sterile conditions including temperature and humidity controls, air supply and filtration, environmental monitoring, cleaning and sanitation, etc.

23.    Section 211.46 specifically requires that Defendants maintain adequate ventilation, air filtration, and exhaust systems to provide "adequate control over air pressure, micro-organisms, dust, humidity, and temperature" and to "control contaminates."[8]

24.    Section 211.56 provides that "[a]ny building used in the manufacture, processing, packing, or holding of a drug product shall be maintained in a clean and sanitary condition, Any such building shall be free of infestation by rodents, birds, insects, and other vermin (other than laboratory animals). Trash and organic waste matter shall be held and disposed of in a timely and sanitary manner."[9]

25.    Section 211.68 provides automatic, mechanical or electrical equipment or other types of equipment used in the manufacture, processing, packing and holding of a drug product "shall be routinely calibrated, inspected, or checked according to a written program designed to assure proper

---

[8] 21 C.F.R. 211.46
[9] 21 C.F.R. 211.56

performance."[10]   Further, "[w]ritten records of those calibration checks and inspections shall be maintained."[11]

26.     Section 211.25 provides "Each person engaged in the manufacture, processing, packing or holding of a drug product shall have education, training and experience or any combination thereof, to enable that person to perform the assigned functions…training in current good manufacturing practice shall be conducted by qualified individuals on a continuing basis and with sufficient frequency to assure that employees remain familiar with CGMP requirements applicable to them."[12]

27.     Section 211.84 provides "each lot of components, drug products containers, and closures shall be withheld from use until the lot has been sampled, tested, or examined, as appropriate, and released for use by the quality control unit…Any lot of such material that does not meet appropriate written specifications of identity, strength, quality and purity and related tests shall be rejected."[13]

## DEFENDANTS' FRAUDULENT SCHEMES

28.     The pharmaceutical products that Defendants introduced into the marketplace were adulterated for purposes of federal law because (1) they were

---

[10] 42 C.F.R. § 211.68
[11] Id.
[12] 42 C.F.R. § 211.25
[13] 42 C.F.R. § 211.84

prepared under unsanitary conditions (resulting in a risk of contamination and patient harm) and (2) Defendants failed to follow cGMP practices with regard to the safety and quality of the products, including the requirement that Edge establish its own appropriate written procedures for quality control and follow them, the requirement to maintain or validate software and equipment used in the manufacture of compounded drugs, the requirement for employees engaged in manufacturing drug products to have required education, training or experience, and the requirement that pharmaceutical components be appropriately inspected prior to release.  Further, pharmaceuticals that Defendants introduced to the marketplace were misbranded because Edge falsely represented that these pharmaceuticals were manufactured in a cGMP compliant facility.

### A.   Defendants' culture of non-compliance:

29.   Relator Stocks is a highly experienced pharmaceutical industry quality officer.  What he encountered at Edge, however, was a business designed by Defendant Chatoff to push drugs out the door as quickly as possible with very little regard for safety or compliance.  Through this disregard for safety or compliance Defendants habitually, and intentionally, violated cGMP requirements.

30.   When Relator arrived to take up his duties at Edge, he found that Chatoff and his leadership team had invested almost no resources into developing

the systems and infrastructure required to maintain FDA cGMP compliance –

and, in turn, to ensure the quality and safety of the drugs Edge was sending to

hospitals and patients across the nation.  As Relator began to fulfill his duties,

including stressing to Chatoff and COO Tyler Wingood the importance of

constructing a consistent and viable quality process, Chatoff made clear to

Relator that Chatoff believes FDA requirements are there to by skirted, stating:

"It's my fucking company and I'll do whatever the fuck I want."

31.    Inevitably, Defendants' operations were in complete chaos.  Edge

had effectively no quality system, no real manufacturing procedures, no "Key

Performance Indicators" or other means of evaluating the company's

performance or progress.  At root, Edge simply had no corporate structure or

culture capable of undertaking and supporting the kind of planning and

methodology required to produce volumes of sterile drugs in accordance with

GMP.

32.    Instead, Chatoff ran the company dictatorially on a day-to-day basis,

driving staff to put out one fire after another with the sole goal of moving product

out the door.  For example, Chatoff frequently sent staff, COO Wingood, and

even his own wife to Relator's office to lobby him to prematurely sign off on the

release of drugs that were subject to quality review.  To the extent any system

was in place to maintain cGMP compliance, it consisted of a pattern of obfuscation designed to create the appearance that a system existed at all.

## B.    Defendants' production and sale of adulterated and misbranded drugs.

33.    As described above, Defendants' adopted a completely unplanned, unstructured business model in a manufacturing space that requires extremely rigorous planning and structure: the production of sterile drugs.  As a result, Defendants routinely produced drugs that were adulterated and misbranded under federal law, because these drugs were produced under unsanitary conditions and lacked compliance with many aspects of cGMP requirements.

34.    In the first half of 2020 alone, Relator Stocks tallied up 458 incidents of failure of Edge Pharma's quality systems.  Relator presented a summary of these incidents to Defendant Chatoff in June 2020. Relator had previously presented the same presentation to COO Wingood, CFO Roger Nadeau, and Director of Quality Control Melissa Bainbridge approximately two weeks prior to the presentation to Chatoff.  In this presentation, Relator urged Defendant Chatoff to recognize the significance of 458 incidents of failure in six months as the impetus to make meaningful compliance improvements.

35.    Relator presented the table below identifying the failures.

| Event Type | 2020 YTD Qty | Qty per Day | Hours of Work per Event | 2020 YTD Hours | Cost ($110 BLC) |
|---|---|---|---|---|---|
| Recalls | 6 | 0.04 | 60 | 360 | $32,400 |
| Laboratory Investigations | 132 | 0.94 | 13 | 1716 | $154,440 |
| Environmental Excursion Investigations | 75 | 0.54 | 15 | 1125 | $101,250 |
| Deviations | 120 | 0.86 | 5 | 600 | $54,000 |
| Investigations | 48 | 0.34 | 20 | 960 | $86,400 |
| Customer Complaints | 11 | 0.08 | 40 | 440 | $39,600 |
| Cancelled Lots | 66 | 0.47 | 1.5 | 99 | $8,910 |
| | | | | | |
| TOTAL | 458 | 3 | 155 | 5,300 | $477,000 |

36.     Relator recommended, in this presentation and many other times, that the only way to limit such egregious violations was to slow production, rebuild the current quality system, rewrite all manufacturing procedures, retrain staff and slowly re-start production operations.

37.     Defendant   Chatoff   refused   to   even   consider   Relator's recommendations and Chatoff's responded to Relator's June 2020 presentation by telling Relator to "go fuck himself."

38.     At that time, Edge had over 34 open "observations" by the FDA and one FDA Warning Letter (the Warning Letter), issued in 2015.  The Warning Letter states explicitly that cGMP deficiencies in Edge's facilities and processes poses a risk of contamination.  Specifically:

- Edge "failed to establish and follow appropriate written procedures that are designed to prevent microbiological contamination of drug products purporting to be sterile, and that include validation of all aseptic and sterilization processes," in violation of 21 C.F.R. § 211.113(b).

- Edge "failed to establish an adequate system for monitoring environmental conditions in aseptic processing areas" in violation of 21 C.F.R. § 211.42(c)(10)(iv).

- Edge failed to test each component for conformity with all appropriate written specifications for purity, strength and quality, 21 C.F.R. § 211.84(d)(2).

39.    Due to the substantial failures observed by the FDA, Edge was in danger of losing its 503B status and being forced to enter a formal consent decree with FDA.  In fact, during a FDA audit in March 2020, the FDA's lead auditor John Misler recognized the severity of the non-compliance that spread throughout Edge's operations.  In a candid exchange, Mr. Misler asked Relator if thought he could get Edge in compliance. Relator answered that he believed he could bring Edge within GMP Compliance and would do so.  With an understanding of Relator's experience and credibility, Mr. Misler accepted Relator's pledge to remedy the significant non-compliance at Edge—likely saving Edge from summarily losing its 503B status.

40.    However, many serious GMP violations were not identified by the FDA and went undetected due to Defendants' intentional deception and lack of disclosure. For instance, beginning on March 25, 2020, there was a serious

contamination event of bacteria "Bacilus altitudinis"[14] at the Edge facilities. Due to the lack of compliance and organization, Edge was storing pallets of cardboard boxes in areas that posed a serious contamination risk, in violation of GMP requirements. The improperly stored cardboard boxes caused a Bacilus altitudinis contamination in the nearby sterile suite "cleanrooms." Relator identified the problem and embarked on a three-day cleaning of the contaminated cleanrooms. However, after this three-day cleaning and against Relator's recommendation, Edge still stored pallets on the floor near designated cleanrooms, in violation of GMP requirements. Unsurprisingly, the bacteria re-emerged due to these non-compliant and unsanitary practices.

41.     Another contamination of the Edge cleanrooms occurred in 2020 when ants were able to enter and contaminate Edge cleanrooms 202 and 302—which were continually used to compound pharmaceuticals despite the clear contamination.

42.     Additionally, Relator Stocks reported in June 2020 that there were significant mold excursion and humidity excursion events due to defective design and insufficient HVAC equipment. Edge did not clean and dis-infect these poorly

---

[14] Bacilus altitudinis is a bacteria that was occurs in diverse habitats including extreme UV-stressed air samples collected in the atmosphere, ocean water, deep freshwater lakes, soil and silt. However, Bacilus altitudinis is not supposed to be in cGMP compliant cleanrooms—which is where it was discovered at Edge.

designed facilities, further exacerbating extensive microbial and micro-organism growth.

43.    Yet another example of the chaos and cGMP violations was in January 2020, when the temperature control of a large refrigerator at Edge malfunctioned and several compounded drugs inside the refrigerator froze, including compounded drugs Midamiacin and Vancamiacin.  In his role as Senior Director of Quality Assurance, Relator ordered that the frozen drugs be thawed and held in a designated "hold cage"—which is a designated area where suspected non-conforming materials are segregated for further inspection before being shipped to customers.[15]  However, Edge did not even have a hold cage and pursuant to Defendant Chatoff's orders to get product out the door, half of the frozen materials were shipped to unsuspecting customers without any safety or efficacy analysis, in violation of GMP regulations.

44.    Many of these violations—whether eventually detected by Edge quality personnel, discovered by regulatory inspection or, most troublingly, never discovered at all, represent significant risk of patient harm.  Yet, as consistently emphasized by Relator to Chatoff and Edge management, and as cited by regulators, Edge still fails to remedy its problems and develop a competent quality control apparatus.

---

[15] This process is required by several GMP regulations, including 42 C.F.R. § 211.84.

45.    In summary, Edge's operations are inconsistent, unsafe, and in violation of federal regulations. These failures are evidenced by numerous open regulatory investigations and, most troubling, the certainty that many other safety and quality concerns with Edge's drugs have yet to be discovered.

## C.    Defendants' adulterated drugs were inevitably paid for with federal dollars.

46.    Although Edge did not sell its products directly to the Medicare or Medicaid programs, Edge's drugs were paid for with federal dollars.  Edge produces a wide range of products that it ships to hospitals and clinics across the nation.   As HHS OIG has explained in a recent report, 92% of Medicare-participating hospitals use compounded sterile drugs produced by outsourcing facilities.[16]    Obviously, many of the adulterated and misbranded drugs compounded and sold by Edge are used in the treatment of patients who are federal beneficiaries, including Medicare beneficiaries.

47.    Edge's sale of adulterated and misbranded drugs are material violations.  Firstly, the federal government would not have paid for Edge's drugs had it known that the drugs were produced under unsanitary conditions and outside of compliance with cGMP requirements.   Secondly, had the FDA been fully aware of the extent of the failure of Edge's quality processes, Edge would

---

[16] U.S. Department of Health and Human Services Office of Inspector General: Most Hospitals Obtain Compounded Drugs From Outsourcing Facilities, Which Must Meet FDA Quality Standards, available at https://oig.hhs.gov/oei/reports/oei-01-17-00090.pdf

have been de-licensed as an Outsourcing Facility and would not have been permitted to market its compounded drugs as such.[17]

48.     Quality considerations are extremely important in choosing sources for compounded drugs.[18]  In fact, 94 percent of hospitals reported that a source's history of federal enforcement action was extremely important in choosing suppliers of compounded drugs; likewise 94 percent of hospitals reported that the history of State actions, such as suspension or revocation of a State license, as being extremely important to choosing suppliers.[19]   Moreover, 92 percent of hospitals stated "product recalls, quality assurance documentation, and 503B registration status" as being extremely important.[20]

49.     Therefore, if the true conditions of Edge's facility and disregard for compliance was known, the vast majority of hospitals would not have purchased compounded drugs from Edge and would not have submitted claims for payment for these drugs to federal health care programs.

---

[17] The state of California's recent regulatory action discussed *infra* demonstrates the FDA's likely removal of Edge's 503B status.

[18] U.S. Department of Health and Human Services Office of Inspector General: Most Hospitals Obtain Compounded Drugs From Outsourcing Facilities, Which Must Meet FDA Quality Standards, at p. 9. available at https://oig.hhs.gov/oei/reports/oei-01-17-00090.pdf

[19] *Id.*

[20] *Id.*

**D.    Edge illegally retaliated against Relator Stocks because of his efforts to prevent false claims and patient harm.**

50.    In July 2020, it came to the attention of Relator Stocks that an allergy set manufactured and shipped by Edge had been mislabeled "Feather Mix," when it actually contained an extract of Dog Epithelia.   This was an extremely serious mislabeling issue that could have had fatal results.

51.    After Relator completed an internal investigation, on July 22, 2020, Relator informed Edge COO Wingood that the allergy set would have to be recalled and that FDA and the State of California (where the set had been shipped) notified of the recall.   Wingood berated Relator in the Edge offices, in front of other personnel, insisting that – given that this recall would be Edge's sixth of 2020 – it could lead to adverse consequences.   Specifically, Wingood went on the say due to Edge's very poor standing with the FDA and the state of California, reporting this recall would likely cause the state of California to ban Edge from selling products in California.   Because roughly 30% of all Edge's revenue was from California, Wingood stated that reporting this recall would cause a substantial loss of business and would cause employees to be terminated.

52.    Mr. Wingood threatened Relator that any resulting layoff or additional FDA actions would be Relator's fault (for complying with his obligation to report the recall) and implied Relator would be terminated for

reporting the recall, stating Relator would be "held personally responsible if [Relator] reported the recall himself."

53.     At no time did Mr. Wingood provide any legitimate justification that a recall was not actually required, but simply threatened Relator and argued that recall would cause a loss of business and jeopardize Edge's already shaky 503B status.

54.     Relator insisted that he would not allow the recall to be concealed from the authorities or be coerced into doing so.

55.     On July 22, 2020, Relator informed Wingood, verbally and via email, of the serious consequences that could occur if Edge concealed the Dog Epithelia recall by sending Wingood several links to FDA authority and media sources detailing incidents where other pharmaceutical companies and executives had been debarred, sanctioned, fined and faced criminal prosecution including serving prison sentences for similar conduct which amounted to attempting to defraud the FDA or otherwise violate GMPs.

56.     In order to prevent adulterated and misbranded allergy treatment sets being distributed in California, and likely ultimately paid for by federal healthcare programs, Relator personally initiated a Class II recall on July 22, 2020 by sending an email to the FDA recall portal.   Specifically, Relator informed the FDA in Recall Number B-0023-2021: "Edge Pharma's allergy stock

vial of Feather Mix, mislabeled as Dog Epithelia, and subsequently used in the preparation of allergy treatment sets, one of which was distributed."

57.     As a result of Relator's reporting of this mandatory recall, Relator was immediately frozen out of Edge executive meetings and high-level decision making.

58.     Meanwhile, in late July and early August 2020, Defendant Chatoff recruited employees to replace Relator.  Defendant Chatoff's actions to recruit a replacement make clear that because of Relator's continued efforts to bring Edge within GMP compliance, culminating with his reporting of the Allergy Treatment Set Recall, Defendants decided to terminate Relator from his employment with Edge.

59.     On August 24, 2020, Wingood verbally informed Relator that he was being terminated from Edge, telling Relator that Edge had "decided to take a different direction on Quality and that [Edge] had hired someone to help them with that."

60.     Prior to this time, Relator had never been the subject of a disciplinary action, write up, or complaint.  The only criticism of Relator's performance by Edge and Chatoff had been that Relator was unwilling to release product due to quality concerns.  Plainly, Relator's termination was retaliatory and based on his efforts to prevent Edge's fraud.

61.     Subsequent to Relator's reporting of the Dog Epethelia recall to the State of California, the Executive Officer of the Board of Pharmacy of the State of California filed an Accusation before that body, citing numerous instances of regulatory violation by Edge and praying that the Board revoke or suspend Edge Pharma's Outsourcing Facility license and prohibit Chatoff from serving as an officer of a licensed facility in the future.

62.     Among the numerous violations cited by the Executive Officer were several related to over 24,000 allergen sets Edge shipped to California.  Edge labeled all of these sets with a "Beyond Use Date" or BUD (effectively, an expiration date) of one year.  Yet, the drug components of these allergen sets were not guaranteed to remain stable for anywhere close to that amount of time – some may remain stable for as little as one week.  "Thus, there was no assurance of the stability of the product, leading to the possibility or likelihood of decomposed or expired components in the product. Moreover, these products were mislabeled with a one-year BUD."  California went on to allege that its investigation revealed major flaws and gaps in Edge's processes with regard to cGMP compliance and proper labeling of these drugs.  All in all, a series of investigations showed highly dangerous and reprehensible failures on the part of Edge to ensure the quality and safety of its drugs.   As a result, Edge's

outsourcing facility license in the state of California appears to have been revoked.

63.     Therefore, as a result of Relator's adherence to quality, patient safety, and compliance, false claims have in fact been prevented because Defendants' adulterated and misbranded pharmaceuticals are no longer sold in California and nor paid for by federal health care dollars. Also as a result of preventing such false claims, Relator was retaliated against and terminated from his employment in violation of the False Claims Act.

**COUNT ONE**
**DEFENDANT PRESENTED OR CAUSED TO BE PRESENTED**
**FALSE CLAIMS PROHIBITED BY 31 U.S.C. §3729(a)(1)(A)**

64.     Relator adopts and incorporates paragraphs 1-63 as though fully set forth herein.

65.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit: Defendant introduced into the marketplace drugs that were adulterated and misbranded under federal statute, some of which were paid for under federal healthcare programs.

66.     The United States paid the false claims described herein and summarized in the previous paragraph.

67.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendant and others by the United States through Medicare for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

### COUNT TWO
### DEFENDANT MADE OR USED FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. §3729(a)(1)(B)

68.     Relator adopts and incorporates paragraphs 1-63 as though fully set forth herein.

69.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or

fraudulent claim or to get a false or fraudulent claim paid or approved by the United States, to wit:   Defendants created records, including forms and correspondence submitted to regulators, that were designed to conceal its non-compliance with Current Good Manufacturing Practices and other federal requirements for producing and marketing compounded sterile drugs.

70.     The false records or statements described herein were material to the false claims caused to be submitted by Defendants to the United States as well as to Defendant Edge's FDA licensure as an Outsourcing Facility.

71.     In reliance upon Defendants' false statements and records, the United States paid false claims caused to be submitted by Defendants that it would not have paid if not for those false statements and records.

72.     Defendant's fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed by the United States for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendant, in an amount equal to treble the damages sustained by reason of Defendants conduct, together with civil penalties as permitted by 31 U.S.C. §3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

## COUNT THREE
## RETALIATION UNDER 31 U.S.C. 3730(h)(1)

73.     Relator adopts and incorporates paragraphs 1-63 as though fully set forth herein.

74.     Defendants knowingly threatened, harassed, discriminated against, and discharged Relator because of lawful acts done by Relator in efforts to stop or prevent violations of the False Claims Act.

75.     As a result of Defendants' retaliatory conduct, Relator has suffered damages of extended periods of lost pay, irreparable harm to his personal and professional reputation, undue hardship forced upon Relator and his family, and extended infliction of emotional distress upon Relator and his family.

WHEREFORE, Relator demands judgment in his favor and against Defendants, in an amount of two times the amount of back-pay accrued since Relator's termination, interest on that back-pay, and compensation for special damages caused by Defendants' discrimination, including litigation costs and attorneys' fees as permitted by 31 U.S.C. § 3730(h)(2).

31

Respectfully submitted,

Alison J. Bell
**Langrock Sperry & Wool, LLP**
210 College Street
PO Box 721
Burlington, VT 05402-0721
Tel: (802) 864-0217
Email: abell@langrock.com


**FROHSIN BARGER & WALTHALL**
Benjamin P. Bucy
100 Main Street
Saint Simons Island, Georgia 31522
Tel: (912)-809-3007
ben@frohsinbarger.com
(Motion Pro Hac Vice Pending)

Attorneys for Relators

## Certificate of Service

The undersigned certifies that a copy of the foregoing Complaint to be served upon the parties named below, on or before July 6, 2021:

**By Certified Mail to:**

United States Attorney for the District of Vermont
Attn: Assistant U.S. Attorney Owen C.J. Foster
United States Courthouse and Federal Building
Post Office Box 570
11 Elmwood Avenue, 3rd Floor
Burlington, VT 05402-0570

**By Certified Mail to:**

Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

/s/ Benjamin P. Bucy
OF COUNSEL